**No. 26-4157**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

TANOA TANOH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the District of Maryland

# BRIEF OF APPELLANT

James Wyda
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF
MARYLAND

Paresh S. Patel
Assistant Federal Public
Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
paresh_patel@fd.org

Daniel N. Lerman
Zachary N. Ferguson
Paul Brzyski
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
(202) 775-4500
zachary.ferguson@hsfkramer.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

JURISDICTION ........ 4

ISSUES PRESENTED ........ 5

STATEMENT OF THE CASE ........ 5

A. Indictment and Guilty Plea ........ 5

B. Presentence Investigation Report ........ 7

C. Sentencing Memoranda ........ 8

1. Tanoh's Sentencing Memorandum and Request for a Two-Level Minor Participant Adjustment ........ 8

2. The Government's Sentencing Memorandum ........ 9

3. Tanoh's Response ........ 10

D. Sentencing Hearing ........ 11

STANDARD OF REVIEW ........ 14

SUMMARY OF ARGUMENT ........ 15

ARGUMENT ........ 17

I. Tanoh's Sentence Is Procedurally Unreasonable Because the District Court Erred in Declining to Apply the Two-Level Minor Participant Reduction under U.S.S.G. § 3B1.2 ........ 17

A. The District Court Committed Legal Error by Improperly Disregarding the Section 3B1.2 Factors ........ 19

B. The District Court Committed Clear Error in Assessing the Relative Culpability of Tanoh and Her Co-Conspirators ........ 25

## TABLE OF CONTENTS—*Continued*

**Page**


C. The District Court Also Erred Because Tanoh Was a "Minor Participant" as the Commentary to Section 3B1.2 Defines that Term ........ 28

1. Tanoh Was "Less Culpable than Most Other Participants in the Criminal Activity" ........ 29

2. The District Court Erred by Not Deferring to the Definition of "Minor Participant" in Application Note 5 ........ 31

(a) The Meaning of "Minor" in Section 3B1.2(b) Is Genuinely Ambiguous ........ 33

(b) The Definition of "Minor" in Application Note 5 Is Reasonable and Entitled to Deference ........ 35

3. The District Court's Error Was Not Harmless ........ 38

(a) Tanoh Would Likely Have Received a Lower Sentence but for the District Court's Guidelines Error ........ 39

(b) The District Court's Attempt to Insulate Its Guidelines Error from Vacatur Is Unavailing ........ 41

II. Tanoh's Sentence Is Procedurally Unreasonable Because the District Court Failed to Conduct an Individualized Assessment in Determining the Term of Her Supervised Release ........ 46

A. The District Court Ignored Section 5D1.2's Requirement to Conduct an "Individualized Assessment" in Determining the Term of Tanoh's Supervised Release ........ 47

B. The District Court's Failure to Conduct the Required Individualized Assessment Was Not Harmless ........ 50

## TABLE OF CONTENTS—*Continued*

**Page**

CONCLUSION ........................................................................................ 52

STATEMENT REGARDING ORAL ARGUMENT ................................. 53

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Gall v. United States*,
552 U.S. 38 (2007) .......... 14

*Hurlburt v. Black*,
925 F.3d 154 (4th Cir. 2019) (en banc) .......... 34

*Kisor v. Wilkie*,
588 U.S. 558 (2019) .......... *passim*

*Molina-Martinez v. United States*,
578 U.S. 189 (2016) .......... 14, 39, 40

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) .......... 40

*United States v. Asbury*,
27 F.4th 576 (7th Cir. 2022) .......... 42, 44, 45

*United States v. Boler*,
115 F.4th 316 (4th Cir. 2024) .......... *passim*

*United States v. Bravo*,
26 F.4th 387 (7th Cir. 2022) .......... 44

*United States v. Carbajal*,
717 F. App'x 234 (4th Cir. 2018) .......... *passim*

*United States v. Carter*,
564 F.3d 325 (4th Cir. 2009) .......... 14

*United States v. Christmann*,
193 F.3d 1023 (8th Cir. 1999) .......... 30

*United States v. Cruickshank*,
837 F.3d 1182 (11th Cir. 2016) .......... 22

*United States v. Daughtrey*,
874 F.2d 213 (4th Cir. 1989) .......... 15

## TABLE OF AUTHORITIES—*Continued*

**Page(s)**

*United States v. Faulls*,
148 F.4th 280 (4th Cir. 2025) ........ 14, 29

*United States v. Florentine*,
147 F.4th 477 (4th Cir. 2025) ........ 42, 43

*United States v. Franklin*,
902 F.2d 501 (7th Cir. 1990) ........ 24

*United States v. Guerrero-Deleon*,
713 F. App'x 163 (4th Cir. 2017) ........ 21

*United States v. King*,
673 F.3d 274 (4th Cir. 2012) ........ 14

*United States v. Kukoyi*,
126 F.4th 806 (2d Cir. 2025) ........ 37

*United States v. Lewis*,
18 F.4th 743 (4th Cir. 2021) ........ 15

*United States v. Maurya*,
25 F.4th 829 (11th Cir. 2022) ........ 39

*United States v. Montes-Flores*,
736 F.3d 357 (4th Cir. 2013) ........ 38, 44

*United States v. Nixon*,
130 F.4th 420 (4th Cir. 2025) ........ 38

*United States v. Richardson*,
96 F.4th 659 (4th Cir. 2024) ........ 14, 32

*United States v. Rodriguez*,
44 F.4th 1229 (9th Cir. 2022) ........ 20, 25

*United States v. Ross*,
912 F.3d 740 (4th Cir. 2019) ........ 43, 49, 50, 51

## TABLE OF AUTHORITIES—*Continued*

**Page(s)**

*United States v. Schaal*,
340 F.3d 196 (4th Cir. 2003) .................................................. 15, 29, 47

*United States v. Shields*,
126 F.4th 356 (4th Cir. 2025) ..................................................... 50

*United States v. Tanksley*,
848 F.3d 347 (5th Cir. 2017) .................................................. 42, 44, 46

*United States v. Van Sach*,
104 F.4th 1003 (7th Cir. 2024) ..................................................... 46

*United States v. Verdeza*,
69 F.4th 780 (11th Cir. 2023) ..................................................... 34

**Statutes & Guidelines**

18 U.S.C. § 1028A ..................................................... 28

18 U.S.C. § 1956(h) ..................................................... 6

18 U.S.C. § 3231 ..................................................... 4

18 U.S.C. § 3553(a) ..................................................... 8, 42, 44

18 U.S.C. § 3553(a)(1) ..................................................... 45, 49

18 U.S.C. § 3553(a)(2)(B) ..................................................... 49

18 U.S.C. § 3553(a)(2)(C) ..................................................... 43

18 U.S.C. § 3553(a)(6) ..................................................... 28, 49

18 U.S.C. § 3742(a) ..................................................... 5

28 U.S.C. § 991(b) ..................................................... 35

28 U.S.C. § 1291 ..................................................... 5

**TABLE OF AUTHORITIES—*Continued***

**Page(s)**


U.S. Sentencing Guidelines:

§ 3B1.2 ........ *passim*
§ 3B1.2(a) ........ 18
§ 3B1.2(b) ........ 8, 17, 37
§ 3B1.2 cmt. n.3 (1987) ........ 36
§ 3B1.2 cmt. n.3(C) ........ 12, 18, 19
§ 3B1.2 cmt. n.3(C)(i) ........ 41
§ 3B1.2 cmt. n.3(C)(ii) ........ 25, 41
§ 3B1.2 cmt. n.3(C)(iii) ........ 27
§ 3B1.2 cmt. n.3(C)(v) ........ 27
§ 3B1.2 cmt. n.5 ........ *passim*
§ 3B1.4 ........ 35
§ 5A ........ 40
§ 5D1.1 cmt. n.1 ........ 49
§ 5D1.2 ........ *passim*
§ 5D1.2(a) ........ 17, 47
§ 5D1.2(b) ........ 47
§ 5D1.2 cmt. n.1 ........ 48, 49
§ 6A1.3 ........ 8
app. C, amend. 835 (effective Nov. 1, 2025) ........ 3, 47, 54
app. C supp., amend. 794 (effective Nov. 1, 2015) ........ 36

**Other Authorities**

*Money Mules*, Fed. Bureau of Investigation, https://tinyurl.com/mrbxxfbe (last visited July 10, 2026) ........ 23, 24

9 *Oxford English Dictionary* (2d ed. 1989) ........ 33

2 *Webster's Third New International Dictionary* (1981) ........ 30, 33

## INTRODUCTION

From 2019 to 2021, Appellant Tanoa Tanoh was involved in a money-laundering conspiracy that sought to disguise financial assets obtained from various scams. Her role in the conspiracy entailed using aliases and shell companies to open bank accounts at financial institutions into which the proceeds of the conspiracy flowed. Tanoh performed that role willingly, but her role was limited: she did not participate in or plan the fraudulent activity that generated the money that filled her accounts; she did not exercise control over or direct others in the criminal conspiracy; and her benefit from the criminal activity was exceedingly modest—a one-time, $50 Visa transfer. At every material turn, her actions were directed by others higher up in the conspiracy.

Tanoh does not dispute that she committed a serious crime. She accepted responsibility for her actions by pleading guilty without the benefit of a plea agreement. [redacted]. She accepts that she will forever be a felon and suffer the collateral consequences of that status. But she does ask that her sentence reflect the reality of her role in the conspiracy.

The district court sentenced Tanoh to 30 months of imprisonment. Although that sentence is below the Sentencing Guidelines range, the district court rejected a two-level adjustment to reflect Tanoh's status as a minor participant in the conspiracy under U.S.S.G. § 3B1.2. In making that decision, the district court committed three significant procedural errors.

*First*, the district court failed to consider the five factors that the Sentencing Commission has crafted to guide the sentencing court's discretion in applying the mitigating-role adjustment under Section 3B1.2. As this Court and its sister courts of appeals have previously held, that failure alone is reversible legal error.

*Second*, the district court's truncated Section 3B1.2 analysis led it to the inexplicable conclusion that Tanoh was just as culpable as one of her co-conspirators, Stephen Oseghale, a man who helped to plan the fraudulent scams at the heart of the conspiracy and whose offense conduct earned a separate conviction for aggravated identity theft. That conclusion was clearly erroneous.

*Third*, even if this Court were to agree with the district court's assessment of Tanoh's culpability relative to her co-conspirators, it

should still vacate Tanoh's sentence. While the district court's Section 3B1.2 analysis was flawed, it did acknowledge that Tanoh was less culpable than two of her three co-conspirators. And the Sentencing Commission's authoritative commentary to Section 3B1.2 defines a "minor participant" as a defendant "who is less culpable than *most other participants in the criminal activity*." U.S.S.G. § 3B1.2 cmt. n.5 (emphasis added). Thus, even if Tanoh was as culpable as Oseghale, she was still—by definition—a minor participant because she was less culpable than her other two co-conspirators, as the government and district court conceded. It was legal error for the district court not to defer to that definition.

There is yet another reason to vacate Tanoh's sentence. Guidelines Section 5D1.2 requires the district court to "conduct an individualized assessment to determine the length of the term" of supervised release. That requirement is the product of recent amendments—effective November 1, 2025—that sought to make sentences fairer by "emphasiz[ing] the importance of judges making individualized decisions about supervised release at all relevant stages."[1] The district court was

[1] U.S.S.G. app. C, amend. 835 (effective Nov. 1, 2025).

aware of this procedural requirement and asked the parties for their positions on the term of Tanoh's supervised release. Even so, the court ordered a two-year term of supervised release (double what Tanoh requested) in a single-sentence pronouncement that was anything but individualized—and ignored Tanoh's mitigation arguments, to boot. The district court's *generalized* assessment is plainly inconsistent with the letter of Section 5D1.2, and this Court should take the opportunity to make clear what this newly amended Guideline requires of sentencing courts.

## JURISDICTION

This is an appeal from a final judgment of the United States District Court for the District of Maryland. Appellant Tanoa Tanoh was charged with a one-count indictment for conspiracy to commit money laundering. JA19-25. Tanoh pleaded guilty without a plea agreement, and the district court entered judgment sentencing Tanoh to 30 months of imprisonment on March 10, 2026. JA1-6. The district court had jurisdiction to enter the judgment under 18 U.S.C. § 3231. Tanoh filed a timely notice of appeal on March 16, 2026. JA166. This Court has jurisdiction over Tanoh's

appeal under 28 U.S.C. § 1291, and authority to examine Tanoh's challenges to her sentence under 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1. Whether the district court erred in denying Tanoh the minor-participant adjustment under U.S.S.G. § 3B1.2—resulting in an incorrect Guidelines calculation and a procedurally unreasonable sentence—by (i) failing to consider the relevant factors listed in the commentary to Section 3B1.2; (ii) finding that Tanoh was as culpable as one of her co-conspirators whose role in the conspiracy was significantly greater; or (iii) failing to defer to the definition of "minor participant" in the commentary to Section 3B1.2.

2. Whether the term of supervised release ordered by the district court was procedurally unreasonable because the district court failed to conduct an individualized assessment under U.S.S.G. § 5D1.2 and failed to address Tanoh's arguments in favor of a shorter term of supervised release.

## STATEMENT OF THE CASE

### A. Indictment and Guilty Plea

On February 29, 2024, a federal grand jury returned a one-count indictment charging Tanoh with conspiracy to commit money laundering,

in violation of 18 U.S.C. § 1956(h). JA19-25. Tanoh pleaded guilty to the indictment on December 17, 2025, without the benefit of a plea agreement. JA72. In her plea letter to the district court, Tanoh acknowledged that the government would be able to prove the following facts beyond a reasonable doubt if the case were to proceed to trial:

> Tanoa Tanoh ("Ms. Tanoh"), as well as co-conspirators Olumide Obidare ("Obidare") and Emmanuel Okereke ("Okereke") conspired to launder funds stolen through a variety of scams, including business e-mail compromise ("BEC") scams, romance scams, and elder fraud scams. Between at least approximately January 31, 2019, and May 21, 2021, Ms. Tanoh used numerous false identification documents, pseudonyms, and fictitious business entities ("shell companies") to facilitate the laundering. For example, Ms. Tanoh opened bank accounts in the pseudonyms and/or shell companies which served as drop accounts for the deposit of fraudulently obtained funds. After receiving the funds in those drop accounts, Ms. Tanoh would then transfer the money to other accounts either she or other co-conspirators controlled. Alternatively, Ms. Tanoh would directly withdraw the money into cash or by purchasing money orders using debit cards associated with the accounts.

JA38. The plea letter, reproduced in its entirety at JA35-41, also listed examples of transactions involving fraudulently obtained funds that passed through Tanoh's accounts, as well as false identification documents bearing Tanoh's photograph that were recovered during the government's investigation. JA38-40. Tanoh's counsel read the factual

statement into the record during her re-arraignment hearing, and Tanoh indicated that she agreed with its content. JA63-72 (Tr. 22:16-31:1).

### B. Presentence Investigation Report

The probation office prepared a presentence investigation report ("PSR") to assist the district court at sentencing. JA202-222. The PSR contained factual statements from Tanoh and the government that largely tracked the factual statement in Tanoh's plea letter. JA204-209 (¶¶ 5-32). The PSR calculated a base offense level of 26 based on an intended loss amount of more than $3,500,000 but less than $9,500,000. JA209 (¶ 37).[2] After adjustments, including for Tanoh's acceptance of responsibility, the PSR calculated a total offense level of 23. JA209-210 (¶¶ 37-46). Based on that offense level—and given that Tanoh was assigned zero criminal history points on account of her clean record—the PSR calculated a Guidelines range of 46 to 57 months of imprisonment. JA214 (¶ 71). The PSR also noted that Tanoh was then employed as a lab technician and had submitted a financial statement indicating that she had no assets. JA213 (¶¶65, 68).

[2] The actual loss amount "not seized or reversed by law enforcement or financial regulatory authorities" was $1,037,761.62. JA209 (PSR ¶ 32).

Among her objections to the PSR, Tanoh contended that she should have received a two-level reduction for mitigating role under U.S.S.G. § 3B1.2(b). JA216. In response, the probation office declined to recommend the adjustment given that the conspiracy to commit money laundering "could not have taken place with [*sic*] her assistance." JA217. Accordingly, the probation office requested that the district court resolve this issue at sentencing pursuant to U.S.S.G. § 6A1.3. JA217.

### C. Sentencing Memoranda

#### 1. Tanoh's Sentencing Memorandum and Request for a Two-Level Minor Participant Adjustment

Prior to sentencing, Tanoh filed a sentencing memorandum and request for a sentence of five years of probation, including 37 months of home detention, based on the sentencing factors set forth in 18 U.S.C. § 3553(a). JA167-191. She also requested a two-level mitigating-role adjustment under U.S.S.G. § 3B1.2(b) given her status as a "minor participant" in the conspiracy. Tanoh explained that while she played an important role in the conspiracy by opening accounts and moving money, she did not participate in the planning or organizing of the criminal activity or exercise decision-making authority over others. JA179-180. Moreover, as the government had conceded at a prior hearing, there was

no evidence that Tanoh was involved in the actual fraudulent schemes that generated the money that entered her accounts. JA179. Tanoh likewise hadn't been charged with fraud or money-laundering offenses in connection with broader conspiracies in which Obidare and Okereke played leading roles, which were the subject of separate cases in the District of Minnesota and Northern District of Ohio. JA179-180.

And while she stood to benefit from the criminal activity, Tanoh emphasized that there was no evidence that she actually benefitted significantly from the conspiracy. To the contrary, Tanoh's lifestyle was exceedingly modest, and she had no significant assets that the government sought to seize. JA181. Tanoh argued that these facts—when viewed through the factors listed in the commentary to Section 3B1.2—indicated that Tanoh's role in the offense qualified her for the minor-participant reduction.

#### 2. The Government's Sentencing Memorandum

The government filed a sentencing memorandum requesting a sentence within the Guidelines range. Among other things, the government took issue with Tanoh's request for a minor-participant adjustment under Section 3B1.2, arguing that her culpability was similar

to that of another member of the conspiracy, Stephen Oseghale. As the government argued, Oseghale—who was indicted alongside Obidare in the District of Minnesota case—did not receive a minor-role adjustment when he was sentenced in 2022 despite playing a role in the Minnesota conspiracy that the government alleged was similar to Tanoh's. JA84-85. Thus, the government concluded, a sentence within the Guidelines range of 46 to 57 months would appropriately reflect Tanoh's culpability.

### 3. Tanoh's Response

Tanoh filed a response to the government's sentencing memorandum. JA192-201. In her response, Tanoh argued that Oseghale's conduct in the conspiracy was more culpable than Tanoh's. Specifically, unlike Tanoh, Oseghale directed others to engage in criminal conduct; diverted the funds to his own use; and used means of identification of real people to facilitate the transfer of funds, conduct for which he was separately convicted of aggravated identity theft. JA196-197. But, more to the point, Tanoh argued that the focus on "whether one particular co-conspirator received the reduction in another case" was misplaced, because Section 3B1.2 "requires the Court to undertake a fact-intensive analysis." JA199. And, under that analysis, Tanoh was clearly

less culpable than most other members of the conspiracy because she was not "involved in the fraud," did not "direct[] others," and did not "direct[] where fraud funds should be transferred." JA199.

### D. Sentencing Hearing

Tanoh was sentenced on March 10, 2026. Much of the hearing focused on Tanoh's only pending objection to the PSR: the omission of the minor-role adjustment under Section 3B1.2. The government conceded that Obidare and Okereke were both more culpable in the criminal activity than Tanoh. JA248 (Tr. 26:4-9); JA230 (Tr. 8:18-21). But it argued that Tanoh should nevertheless be denied the minor-participant reduction because her role in laundering fraudulently obtained funds was similar to Oseghale's. JA229 (Tr. 7:9-19).

Tanoh argued that her role in the offense was less culpable relative to Oseghale's, as the factual basis of his plea agreement made clear. JA233 (Tr. 11:3-11). Specifically, Tanoh directed the court to subparagraphs 2(d) and (e) of Oseghale's plea agreement, which stated that Oseghale "directed coconspirators" and "divert[ed] . . . funds to his own use." JA233 (Tr. 11:3-11); JA126 (¶ 2(d), (e)). In response, the government pointed to certain communications between Tanoh and her

co-conspirators in which Tanoh provided information about money-laundering accounts. JA234-236 (Tr. 12:1-14:2). The government argued that these communications provided evidence that Tanoh was "directing" her co-conspirators much like Oseghale did. JA234-236 (Tr. 12:1-14:2).

The district court denied the minor-participant reduction. Its analysis did not reference any of the five factors listed in the commentary to Section 3B1.2. *See* U.S.S.G. § 3B1.2 cmt. n.3(C). Instead, the district court focused on the fact that Tanoh was "involved in a very significant way, over multiple years, multiple transactions" in the conspiracy, and that she had "control over multiple bank accounts that were specifically tied to her." JA237 (Tr. 15:19-25). The district court also observed that while Tanoh "was taking direction from Mr. Obidare or others," she was also "providing information back" to them. JA238 (Tr. 16:3-9). For those reasons, the district court found that while Tanoh was "less culpable" than conspiracy leaders like "Mr. Obidare," her "role was not so clearly minor or less culpable as compared to someone like Mr. Oseghale." JA238 (Tr. 16:10-17).

The district court also rejected Tanoh's request for a sentence of five years of probation, sentencing her instead to 30 months of imprisonment

followed by two years of supervised release. JA275-276 (Tr. 53:13-54:6). In determining the duration of supervised release, the district court acknowledged the recent amendments to U.S.S.G. § 5D1.2, which now requires a court to make an "individualized assessment" regarding the length of the term. JA268-269 (Tr. 46:20-47:8). The district court also invited the parties' arguments on what the term of supervised release should be. JA268-269 (Tr. 46:20-47:8). Even so, the district court sentenced Tanoh to two years of supervised release with little explanation for that specific term, and without addressing Tanoh's mitigation arguments in favor of a one-year term. The district court's single-sentence explanation for the term cited the generic rationales of "facilitat[ing] payment of restitution" and "monitor[ing]" Tanoh "to avoid recidivism." JA275-276 (Tr. 53:21-54:1).

After announcing Tanoh's 30-month term of imprisonment, the district court stated that it "would impose the same sentence based on the [Section] 3553(a) factors, even if the guideline calculations were as proposed by the defendant." JA275 (Tr. 53:17-20). The court did not address the parties' dispute over the minor-participant adjustment in

particular, nor how its consideration of the Section 3553(a) factors would have resulted in the same sentence even if Tanoh had received it.

## STANDARD OF REVIEW

This Court reviews sentences for abuse of discretion. *United States v. King*, 673 F.3d 274, 283 (4th Cir. 2012). "However, [the Court] must first ensure that the district court has not committed any 'significant procedural error.'" *Id.* (quoting *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)). "A district court that 'improperly calculates' a defendant's Guidelines range, for example, has committed a 'significant procedural error.'" *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016) (alteration adopted) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). A district court also commits "significant procedural error" when it "fail[s] to adequately explain the chosen sentence," *King*, 673 F.3d at 283 (citation omitted), and it abuses its discretion when it "misapprehends or misapplies the applicable law," *United States v. Richardson*, 96 F.4th 659, 665 (4th Cir. 2024).

"In evaluating a district court's application of a Sentencing Guideline, [the] standard of review depends on whether a given dispute is mostly legal or factual." *United States v. Faulls*, 148 F.4th 280, 284-85

(4th Cir. 2025) (internal quotation marks and citation omitted). A district court's determination that a defendant wasn't a minor participant in the criminal activity is reviewed for clear error. *United States v. Daughtrey*, 874 F.2d 213, 218 (4th Cir. 1989). But the question of whether the district court applied the correct legal standard to reach that determination is reviewed *de novo*. *United States v. Lewis*, 18 F.4th 743, 750 (4th Cir. 2021). A district court's legal interpretation of the Sentencing Guidelines and its commentary is likewise reviewed *de novo*. *United States v. Schaal*, 340 F.3d 196, 198 (4th Cir. 2003).

## SUMMARY OF ARGUMENT

1. The district court erred in denying Tanoh the two-level minor-participant adjustment under Section 3B1.2 for three independent reasons.

*First*, the district court's analysis ignored the five factors listed in the commentary to Section 3B1.2. That legal error is reason enough to vacate Tanoh's sentence, as decisions by this Court and other courts of appeals make clear.

*Second*, the district court's distorted Section 3B1.2 analysis led it to conclude that Tanoh's culpability in the offense was similar to that of

Oseghale, and thus that she was ineligible for the minor-participant adjustment. That decision was clearly erroneous because Oseghale's involvement in the conspiracy was far deeper and more central than Tanoh's, a distinction the district court might have appreciated had it considered the Section 3B1.2 factors.

*Third*, even if the district court's analysis were correct, Tanoh was still a "minor participant" as the commentary to Section 3B1.2 defines that term. A "minor participant" is a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5. The district court found that Tanoh was less culpable than two of her three co-conspirators—or, in other words, that she was "less culpable than *most other participants* in the criminal activity." *Id.* (emphasis added). Yet the court declined to apply the minor-participant reduction, ignoring the commentary's definition. That was error: under the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019), the district court should have deferred to the commentary's definition of "minor participant" because the term "minor" is genuinely ambiguous and the Sentencing Commission's interpretation is reasonable.

2. This Court should also vacate Tanoh's sentence because the district court failed to conduct the "individualized assessment" required by U.S.S.G. § 5D1.2 in sentencing Tanoh to two years of supervised release. In 2025, the Sentencing Commission amended Section 5D1.2 to require that the sentencing court "conduct an individualized assessment to determine the length of the term" of supervised release. U.S.S.G. § 5D1.2(a). Despite acknowledging this new requirement, the district court failed to address Tanoh's arguments in favor of one year of supervised release and provided a generic, one-sentence justification for the two-year term it imposed. The district court's failure to conduct the "individualized assessment" that Section 5D1.2 now requires is yet another reason to vacate Tanoh's sentence.

## ARGUMENT

### I. Tanoh's Sentence Is Procedurally Unreasonable Because the District Court Erred in Declining to Apply the Two-Level Minor Participant Reduction under U.S.S.G. § 3B1.2

A defendant is entitled to a two-level reduction in her offense level when she is a "minor participant" in the criminal activity. U.S.S.G. § 3B1.2(b). The commentary to Section 3B1.2(b) defines a "minor participant" as someone "who is less culpable than most other participants in the criminal activity, but whose role could not be

described as minimal." U.S.S.G. § 3B1.2 cmt. n.5.[3] The commentary also provides a non-exhaustive list of five factors to be considered in determining whether to apply any mitigating-role adjustment, including the minor-role adjustment. *See* U.S.S.G. § 3B1.2 cmt. n.3(C).

Here, the district court committed three distinct errors in applying Section 3B1.2(b) to the facts of this case. First, the district court disregarded the Section 3B1.2 factors in determining whether Tanoh should receive a mitigating-role adjustment. That legal error is reason enough to vacate Tanoh's sentence. Second, the district court's flawed Section 3B1.2 analysis led it to find that Tanoh was as culpable as Oseghale, a conclusion the record does not support, and which this Court reviews for clear error. Third, even if the district court were correct about Tanoh's and Oseghale's relative culpability, it still erred by denying the minor-participant reduction because Tanoh was plainly less culpable than "*most* other participants in the criminal activity," U.S.S.G. § 3B1.2 cmt. n.5 (emphasis added), and thus by definition was a "minor participant" as the commentary to Section 3B1.2 defines that term. The

[3] A "minimal participant" is entitled to a four-level reduction. U.S.S.G. § 3B1.2(a).

district court's failure to correctly apply the definition of "minor participant" in Section 3B1.2 is a legal issue this Court reviews *de novo*.

### A. The District Court Committed Legal Error by Improperly Disregarding the Section 3B1.2 Factors

In considering whether to apply a mitigating-role reduction, a district court "must compare the culpability of the defendant to her codefendants in the criminal enterprise for which she has been convicted." *United States v. Carbajal*, 717 F. App'x 234, 240 (4th Cir. 2018). In making this comparison, the district court is guided by the five factors listed in the commentary to Section 3B1.2:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C).

This Court, like its sister courts of appeals, has made clear that a district court must consider all of the Section 3B1.2 factors at sentencing. *See, e.g.*, *Carbajal*, 717 F. App'x at 241 (vacating sentence and remanding to district court where "we cannot determine from the record whether the district court . . . considered the factors now listed in the commentary to § 3B1.2"); *United States v. Rodriguez*, 44 F.4th 1229, 1233 (9th Cir. 2022) ("[D]istrict courts must consider *all* of these [§ 3B1.2] factors when determining whether to grant a mitigating-role adjustment."). But the district court here largely ignored them. It never considered, for example, Tanoh's understanding of the scope and structure of the conspiracy (factor (i)), or the degree to which she participated in planning or organizing the conspiracy (factor (ii)). Indeed, it never even mentioned the Section 3B1.2 factors. Instead, the district court focused solely on the fact that Tanoh's involvement spanned "multiple years, multiple transactions" in which she "ha[d] control over multiple bank accounts" and was "passing on information" to her co-conspirators "to continue to make this [conspiracy] proceed." JA237-238 (Tr. 15:19-16:9). On that basis alone, the district court concluded that Tanoh's "role was not so clearly minor or less culpable as compared to someone like Mr. Oseghale,"

and that Tanoh therefore was not a minor participant under Section 3B1.2. JA238 (Tr. 16:10-17).

The district court's failure to consider the Section 3B1.2 factors is reason enough for reversal. The Sentencing Commission added the five factors to Section 3B1.2 in a 2015 amendment after finding that the mitigating-role adjustment was being "applied inconsistently and more sparingly than the Commission intended." *Carbajal*, 717 F. App'x at 240 (citation omitted). This Court has observed that the 2015 amendment was a "clarifying amendment" meant to "change[] how sentencing courts in this circuit apply the minor-participant reduction." 717 F. App'x at 240-41. And, consistent with the Sentencing Commission's intent, this Court has cautioned that a district court "must consider" the Section 3B1.2 factors. *United States v. Guerrero-Deleon*, 713 F. App'x 163, 165 (4th Cir. 2017). In *United States v. Carbajal*, this Court joined "several of the other federal circuit courts" in vacating and remanding a defendant's sentence where it was not apparent "from the record whether the district court . . . considered the factors now listed in the commentary to § 3B1.2." *Carbajal*, 717 F. App'x at 241.

Because the district court here ignored these factors and the thoughtful comparison that they require, this Court should vacate and remand for resentencing. *See Carbajal*, 717 F. App'x at 241; *see also United States v. Cruickshank*, 837 F.3d 1182, 1195 (11th Cir. 2016) (vacating sentence and remanding to the district court with instructions to consider the § 3B1.2 factors because it was "legal error for the district court" to consider only the drug quantity involved in the offense).

The district court's reasoning was unsound in any event—even as to the facts that it *did* consider in lieu of the Section 3B1.2 factors. As the PSR notes, Tanoh's involvement in the conspiracy entailed opening at least 15 bank accounts at various financial institutions under false names. JA204, JA206-207 (¶¶ 5-6, 18-19). Those accounts served as "drop" accounts for funds fraudulently obtained by other members of the conspiracy. JA204, JA206 (¶¶ 5, 18). Tanoh was not involved in the business-email or romance-fraud schemes that generated the money that entered her accounts; she did not create the fake identification documents that were used in committing the offense; and she did not understand the full scope and structure of the criminal enterprise. She was, in other words, a textbook "money mule." And though she performed

that role willingly, at every material turn her actions were directed by others higher up in the conspiracy. For example, the PSR describes a typical incident in 2019 where a victim wired money to one of Tanoh's accounts. Okereke then messaged Tanoh instructing her to write checks from the account, the payment amount to be listed on those checks, and what to write in the payee and memo fields. JA207 (¶ 20). Her role was to execute instructions—and she did so willingly. But she did not plan the criminal activity or exercise discretion in any meaningful way.

While it is true that Tanoh had some "control" over the accounts and "provid[ed] information back" to Okereke and Obidare regarding those accounts, as the district court observed, JA237-238 (Tr. 15:19-16:8), that is always true of low-level money-laundering defendants. Money mules "move funds in various ways, including through bank accounts, cashier's checks, virtual currency, prepaid debit cards, or money service businesses." *Money Mules*, Fed. Bureau of Investigation, https://tinyurl.com/mrbxxfbe (last visited July 10, 2026) ("Money Mules Bulletin"). A mule's formal "control over multiple bank accounts," JA237 (Tr. 15:24), is invariably part of the role—the whole point is to "add layers

of distance between crime victims and criminals" committing the fraudulent acts, Money Mules Bulletin.

So too is the mule's "passing on information," JA238 (Tr. 16:7), to those higher up in the conspiracy. Given the mule's control over the bank accounts, she will inevitably need to pass along information—even as basic as routing and account numbers—to her higher-level co-conspirators. But that doesn't mean that a money mule necessarily exerts control over a money-laundering conspiracy such that she cannot qualify as a "minor participant" under Section 3B1.2. *See, e.g.*, *United States v. Franklin*, 902 F.2d 501, 510 (7th Cir. 1990) (affirming minor-participant adjustment where defendant "participated in at least four activities relating to money laundering," including "convert[ing] drug proceeds from cash to cashier's checks and back to try to disguise the source of payments" and "put[ting] her name on safe deposit boxes which were used to store large amounts of her brother's drug proceeds"). Yet that is exactly what the district court held here: that Tanoh was ineligible for the minor-participant reduction solely because she "ha[d] control over multiple bank accounts" and was "passing on information" about those accounts to Obidare and Okereke. JA237-238 (Tr. 15:19-16:9).

### B. The District Court Committed Clear Error in Assessing the Relative Culpability of Tanoh and Her Co-Conspirators

The district court's flawed Section 3B1.2 analysis led it to a flawed conclusion: that Tanoh was not a minor participant because her role in the offense "was not so clearly minor or less culpable as compared to someone like Mr. Oseghale," JA238 (Tr. 16:13-14). That ruling was clearly erroneous.

For starters, Oseghale's involvement in the conspiracy was far deeper and more central than Tanoh's. His plea agreement makes clear that he conspired with Obidare and others to "*devise* and engage in a scheme and conspiracy to defraud individuals and businesses." JA126 (¶ 2(b)) (emphasis added). There is no evidence that Tanoh helped others "devise" or otherwise plan the fraudulent schemes at the heart of the conspiracy. That difference signifies Tanoh's relatively minor role. *See, e.g.*, *Rodriguez*, 44 F.4th at 1236 ("[O]ne who devises a plan and organizes others is likely to play a more significant role, while one who simply follows instructions is likely to play a less significant role."). Had the court properly considered the Section 3B1.2 factors (as it was required to do), it would have appreciated this distinction. *See* U.S.S.G. § 3B1.2 cmt.

n.3(C)(ii) (instructing sentencing court to consider "the degree to which the defendant participated in planning or organizing the criminal activity").

In addition to his role in planning the fraud, Oseghale's money-laundering activities were also far more egregious than Tanoh's. Oseghale's plea agreement makes clear that he "*directed* coconspirators . . . to transfer proceeds of online romance scams and business email compromises" to accounts that he controlled, which he then "divert[ed] . . . to his own use." JA126 (¶ 2(d)) (emphasis added). For example, his plea agreement describes an instance in which Oseghale "directed approximately $10,000 in romance scam funds from victim J.O. into an account under his control," from which he withdrew funds "in his real name and for his own benefit." JA126 (¶ 2(f)).

By contrast, Tanoh never "directed" any of her co-conspirators. None of the messages between Tanoh and her co-conspirators that the government cited at sentencing suggest that Tanoh "directed" anything; instead, they show a low-level functionary who did what she was told and provided information as requested. JA159-165 (Fantigrossi affidavit ¶ 18). Even the district court acknowledged that her conduct was more

in the nature of "passing on information" to co-conspirators than "direction." JA238 (Tr. 16:3-9). That distinction would also have factored into the district court's Section 3B1.2 analysis if it had considered the Section 3B1.2 factors. *See* U.S.S.G. § 3B1.2 cmt. n.3(C)(iii) (instructing sentencing court to consider "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"). But again, the court failed to consider and apply those factors, as required.

There is also no evidence that Tanoh ever diverted money for her personal benefit, as Oseghale repeatedly did. JA126-127 (¶ 2(f)). Indeed, the only clear evidence that Tanoh personally benefited from her participation in the conspiracy at all was a $50 Visa transfer that she received from Okereke while travelling to France in 2019. JA164; JA262 (Tr. 40:1-11). Tanoh's modest relative personal benefit is yet another factor distinguishing her conduct from Oseghale's—and yet another factor that the district court should have considered, but didn't, in its Section 3B1.2 analysis. *See* U.S.S.G. § 3B1.2 cmt. n.3(C)(v) (instructing sentencing court to consider "the degree to which the defendant stood to benefit from the criminal activity").

Among the most significant facts distinguishing Oseghale's culpability from Tanoh's is his use of a real victim's sensitive personal information to further the ends of the conspiracy. *See* JA127 (¶ 2(g)). For that conduct, Oseghale was convicted of aggravated identity theft under 18 U.S.C. § 1028A. *See* JA125-134; JA252 (Tr. 30:21-22). There is no evidence that Tanoh ever committed identity theft to further the conspiracy, and she wasn't convicted of a fraud crime like Oseghale was. Indeed, the district court appreciated this distinction and its relevance to Tanoh's relative culpability while discussing the need to avoid sentencing disparities under § 3553(a)(6). *See* JA274 (Tr. 52:9-16). But when it came to determining Tanoh's eligibility for a minor-participant adjustment under Section 3B1.2, the district court disregarded this critical distinction between Tanoh's and Oseghale's offense conduct.

### C. The District Court Also Erred Because Tanoh Was a "Minor Participant" as the Commentary to Section 3B1.2 Defines that Term

As the preceding section makes clear, the district court committed legal error by ignoring the Section 3B1.2 factors, which distorted its analysis and led it to the clearly erroneous conclusion that Tanoh's culpability was "not so clearly minor or less culpable as compared to

someone like Mr. Oseghale." JA238 (Tr. 16:13-14). But even if this Court were to affirm that flawed analysis, it should still vacate Tanoh's sentence because the district court failed to apply the definition of "minor participant" in the commentary to Section 3B1.2—an issue this Court reviews *de novo*. *Schaal*, 340 F.3d at 198; *see also Faulls*, 148 F.4th at 285 (the "standard of review approaches *de novo*" when "the facts are undisputed" and "the only question before [the Court] is one of Guidelines application" (cleaned up)).

#### 1. Tanoh Was "Less Culpable than Most Other Participants in the Criminal Activity"

Application Note 5 of the commentary to Section 3B1.2 defines a "minor participant" as a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 cmt. n.5 ("Application Note 5"). The phrase "in the criminal activity" means that a defendant must be compared to "her codefendants in the criminal enterprise for which she has been convicted." *Carbajal*, 717 F. App'x at 240. And the plain meaning of the word "most" in the phrase "most other participants in the criminal activity" means that a defendant is a minor participant when she is less culpable than a majority of the "other participants in the

criminal activity." 2 *Webster's Third New International Dictionary* 1474 (1981) (defining "most" as "the greatest number of : the majority of").

Whether or not she was less culpable than Oseghale, Tanoh was a "minor participant" as Application Note 5 defines that term. The "other participants in the criminal activity," U.S.S.G. § 3B1.2 cmt. n.5, were Obidare, Okereke, and Oseghale, as the district court acknowledged. JA227 (Tr. 5:16-25). To qualify as a "minor participant" under Section 3B1.2, Tanoh was therefore required to show that she was less culpable than at least two of those three participants—*i.e.*, less culpable than "*most other* participants in the criminal activity." U.S.S.G. § 3B1.2 cmt. n.5 (emphasis added); *cf. United States v. Christmann*, 193 F.3d 1023, 1025 (8th Cir. 1999) (declining to apply minor-participant reduction where "there were three participants, and [the defendant's] culpability ranks in the middle of the three" because, "[a]s a matter of arithmetic, he cannot be said to be less culpable than 'most' of the other participants").

Tanoh made that showing. And this Court need not take her word for it—the district court and government *agreed* on that point. The district court "certainly conclude[d] that [Tanoh] was less culpable than

Mr. Obidare," JA237 (Tr. 15:19-21), a point on which the government agreed, JA248 (Tr. 26:4-9); JA229 (Tr. 7:9-19). As for Okereke, the district court found that his participation in the conspiracy was "similar to Mr. Obidare's type of conduct," JA230 (Tr. 8:13-15)—that is, at a higher level than Tanoh and more culpable. The government again agreed with that finding, adding that Okereke "does seem to be more the direct-communication-with-bad-actors level, the people who are actually doing the intrusions, the romance fraud, and potentially trying to get the money back that they've stolen." JA230 (Tr. 8:18-21).

Thus, both the district court and the government conceded that Tanoh was "less culpable than most other participants in the criminal activity," U.S.S.G. § 3B1.2 cmt. n.5—namely, Obidare and Okereke, two of the three other participants. She was therefore a "minor participant" as Application Note 5 defines that term.

### 2. The District Court Erred by Not Deferring to the Definition of "Minor Participant" in Application Note 5

The district court found that Tanoh was less culpable than most of the other participants in the criminal activity—a finding that by definition renders her a "minor participant" under Application Note 5.

The district court also recited Application Note 5's definition of "minor participant" during the sentencing hearing. JA237 (Tr. 15:10-14). Yet the district court denied Tanoh the minor-participant adjustment, necessarily declining to apply that definition. That was error. Either the district court simply failed to apply the very commentary that it found applicable, which is reversible error. *See, e.g.*, *Richardson*, 96 F.4th at 665 (a district court abuses its discretion when it "misapplies the applicable law"). Or it decided—without any explanation—that the commentary did not warrant deference. That too is reversible error because the definition of "minor participant" in Application Note 5 is entitled to *Auer* deference under *Kisor v. Wilkie*, 588 U.S. 558 (2019).

As this Court explained in *United States v. Boler*, 115 F.4th 316 (4th Cir. 2024), "[w]hen deciding whether to defer to the Guidelines' commentary, we apply the framework set forth in *Kisor v. Wilkie*." *Id.* at 322. Under that framework, the Court defers "to an agency's interpretation of its own regulations, and in turn, to the commentary to the Guidelines" when "a regulation is genuinely ambiguous." *Id.* (citation omitted). To be deemed "genuinely ambiguous," uncertainty about the meaning of a regulation must persist "'even after a court has resorted to

all the standard tools of interpretation,' including consideration of the 'text, structure, history, and purpose of a regulation.'" *Id.* at 323 (quoting *Kisor*, 588 U.S. at 573, 575). "Once a regulation is determined to be genuinely ambiguous, 'the agency's reading must fall within the bounds of reasonable interpretation' in order to be accorded deference." *Id.* (quoting *Kisor*, 588 U.S. at 576).

**(a) The Meaning of "Minor" in Section 3B1.2(b) Is Genuinely Ambiguous**

"We begin with the ordinary meaning" of the term "minor." *Boler*, 115 F.4th at 323. When the Guidelines were enacted and first used the term "minor" in § 3B1.2, dictionaries contained numerous definitions of that word. For example, *Webster's Third New International Dictionary* contains no less than 23 definitions of "minor."[4] Other contemporaneous dictionaries are similarly indeterminate.[5] "These multiple and varied definitions alone demonstrate that '[minor]' could mean a number of different things depending on the dictionary [or definition] of one's choice." *Boler*, 115 F.4th at 324-25. "Thus, there is no single right answer

[4] *See* 2 *Webster's Third New International Dictionary* 1439-40 (1981).
[5] *See, e.g.*, 9 *Oxford English Dictionary* 823-24 (2d ed. 1989) (listing over a page of definitions for "minor").

to the meaning of '[minor]' based on its plain reading." *Id.* at 325 (internal quotation marks and citation omitted).

"Nor do the various canons of statutory interpretation" render the term "minor" in Section 3B1.2 "any less ambiguous." *Boler*, 115 F.4th at 325. In interpreting the plain language of a term like "minor," the Court looks to "the specific context in which the language is used, and the broader context of the" regulation as a whole. *Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019) (en banc) (citation omitted).

The broader context of Section 3B1.2 does little to clarify the term "minor." While it suggests that a "minimal" participant is less culpable than a minor participant—and thus deserves a four-level reduction, rather than a two-level reduction—the text of Section 3B1.2 sheds little light on what "minor" means in subsection (b). *See United States v. Verdeza*, 69 F.4th 780, 794 (11th Cir. 2023) ("The Guidelines provide a two-level reduction for 'minor' participants and a four-level reduction for 'minimal' participants. But that's all Section 3B1.2 says. The commentary fleshes out what those terms mean." (citation omitted)). The broader context of Part B injects further confusion by introducing yet

another sense of the word "minor" in Section 3B1.4. *See* U.S.S.G. § 3B1.4 ("Using a Minor to Commit a Crime").

The Guidelines' purpose similarly fails to clarify the term "minor." In promulgating the Guidelines, the Sentencing Commission was charged with "establish[ing] sentencing policies and practices for the Federal criminal justice system that . . . maintain[] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors." 28 U.S.C. § 991(b) (setting forth "[t]he purposes of the United States Sentencing Commission"). Section 3B1.2 generally furthers that end by providing for an offense-level reduction for a "minor" or "minimal" role in the offense. But that statement of purpose does little to clarify the circumstances under which a defendant's role in the offense could be considered "minor," "minimal," or neither.

**(b) The Definition of "Minor" in Application Note 5 Is Reasonable and Entitled to Deference**

Given that the term "minor" in Section 3B1.2 is genuinely ambiguous, the Court must "ask whether the commentary falls 'within the bounds of reasonable interpretation' by the relevant agency." *Boler*, 115 F.4th at 327 (quoting *Kisor*, 588 U.S. at 576). "To make this

assessment," the Court must "consider whether the commentary is the Commission's 'official position,' 'implicates its substantive expertise' in some way, and reflects the 'fair and considered judgment' of the Commission such that it is not simply a 'convenient litigating position.'" *Id.* at 328 (alteration adopted) (quoting *Kisor*, 588 U.S. at 577-79).

Application Note 5 easily satisfies that test. First, "[t]he character and context of the commentary entitle it to controlling weight" because "[t]he commentary's definition[]" of minor is "the Commission's 'official position'" rather than a "'convenient litigating position.'" *Id.* at 328 (quoting *Kisor*, 588 U.S. at 577-79). Since 1987 when the Guidelines were first enacted, the Commission has consistently defined "minor participant" to mean a "participant who is less culpable than *most other* participants." *See* U.S.S.G. § 3B1.2 cmt. n.3 (1987) (emphasis added). In 2015, the Commission amended that phrase to read "less culpable than most other participants <u>in the criminal activity</u>," a change meant to reinforce that a defendant should be compared to "only those persons who actually participated in the criminal activity at issue in the defendant's case, so that the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand." *See* U.S.S.G.

app. C supp., amend. 794 (effective Nov. 1, 2015). The definition of "minor participant" in Application Note 5 is thus "the longstanding position of the Commission." *Boler*, 115 F.4th at 328.

Second, the commentary reflects the Commission's "substantive expertise" and "fair and considered judgment." *Id.* at 328 (quoting *Kisor*, 588 U.S. at 577, 579). As this Court observed in *Boler*, the Commission each year collects and analyzes a massive amount of sentencing data and reviews and revises the Guidelines in light of those data as well as "decisions from courts of appeals, sentencing-related research, congressional action, and input from the criminal justice community." *Boler*, 115 F.4th at 328 (citation omitted). The Guidelines produced by that process, including their commentary, are thus "the result of the well-reasoned decision making by the Commission." *Id.*; *see also, e.g.*, *United States v. Kukoyi*, 126 F.4th 806, 821 (2d Cir. 2025) (Menashi, J., concurring in part and concurring in the judgment) ("[t]here is no concern that the guidelines commentary does not" satisfy step two of the *Kisor* analysis), *cert. denied*, 146 S. Ct. 1777 (2026).

Because there is genuine ambiguity as to the meaning of "minor" in Section 3B1.2(b) and the "character and context" of the commentary

confirm that it deserves "controlling weight," *Boler*, 115 F.4th at 328, the district court erred by not deferring to Application Note 5 in determining whether Tanoh qualified as a "minor participant."

### 3. The District Court's Error Was Not Harmless

As explained in the preceding sections, the district court improperly rejected a minor-participant reduction in calculating Tanoh's Guidelines range. That error resulted in a procedurally unreasonable sentence. *United States v. Nixon*, 130 F.4th 420, 428 (4th Cir. 2025) ("A district court commits procedural error by failing to calculate (or improperly calculating) the Guidelines range." (citation omitted)). This Court "must reverse procedural error, unless the error was harmless." *Id.* (internal quotation marks and citation omitted). "There is an effective presumption against harmlessness where a district court improperly calculates a Guidelines range." *Id.* (cleaned up). To overcome that presumption, "the record from the sentencing hearing must provide the reviewing court with *knowledge* that the district court would have reached the same result even if it had decided the Guidelines issue the other way." *United States v. Montes-Flores*, 736 F.3d 357, 370 (4th Cir.

2013) (emphasis in original) (cleaned up), *superseded on other grounds by statute*, S.C. Code Ann. §§ 6-3-29, 16-3-600.

#### (a) Tanoh Would Likely Have Received a Lower Sentence but for the District Court's Guidelines Error

The district court's incorrect computation of the Guidelines range clearly influenced Tanoh's ultimate sentence. As the Supreme Court explained in *Molina-Martinez v. United States*, 578 U.S. 189 (2016), the "Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar," anchoring the district court's analysis. *Id.* at 200. Thus, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 198; *see also United States v. Maurya*, 25 F.4th 829, 836 (11th Cir. 2022) ("[T]he application of an incorrect Guidelines range is almost always enough 'to show a reasonable probability of a different

outcome absent the error.'" (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018)).

Here, the district court computed Tanoh's Guidelines range at 46 to 57 months based on an offense level of 23. JA239 (Tr. 17:4-10). Given Tanoh's "extraordinary acceptance of responsibility" and "lack of any criminal record," among other things, the district court ultimately sentenced Tanoh to 30 months of imprisonment. JA274-275 (Tr. 52:22-53:2, 53:13-15). Although that sentence was below the incorrectly computed Guidelines range, the Guidelines' anchoring effect was on full display: the district court repeatedly characterized Tanoh's sentence as "a downward variance *from the guidelines range*." JA275 (Tr. 53:1-2); *see also* JA245-246 (Tr. 23:20-24:3); JA275 (Tr. 53:13-15). That alone shows "a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 578 U.S. at 198.

If the district court had correctly applied the minor-participant adjustment, Tanoh's Guidelines range based on an offense level of 21 would have been 37 to 46 months, a full *nine months* shorter than the range the district court computed. U.S.S.G. § 5A. There is every reason to think that the district court would have varied downward from that

Guidelines range as well. The reasons the court cited for its downward variance only obliquely overlap with the Section 3B1.2 factors; there is no indication that the variance accounted for Tanoh's limited understanding of the scope and structure of the conspiracy, U.S.S.G. § 3B1.2 cmt. n.3(C)(i), or the fact that she had no hand in organizing or planning the criminal activity, *id.* § 3B1.2 cmt. n.3(C)(ii)—factors which the district court wholly neglected to consider in its sentencing analysis, *see supra* p. 20. That is especially true of Tanoh's "extraordinary acceptance of responsibility" and "lack of any criminal record," factors that significantly drove the downward variance, and which are totally orthogonal to the Section 3B1.2 analysis. JA274-275 (Tr. 52:22-53:2). Thus, if the district court had correctly concluded that Tanoh was a minor participant under Section 3B1.2, the court's stated reasons for varying from the Guidelines range would still have applied and she likely would have received a downward variance from the correct Guidelines range.

#### (b) The District Court's Attempt to Insulate Its Guidelines Error from Vacatur Is Unavailing

Attempting to inoculate its sentence against reversal, the district court cursorily asserted that it "would impose the same sentence based on the [Section] 3553(a) factors, even if the guidelines calculations were

as proposed by the defendant." JA275 (Tr. 53:17-20). But, as this Court has explained, a "district court cannot insulate a sentence from vacatur through a general statement that it would have imposed [the] same sentence regardless of any error." *United States v. Florentine*, 147 F.4th 477, 484 (4th Cir. 2025). This Court's sister circuits have similarly held that a district court may not "nullify the guidelines by way of a simple assertion that any latent errors in the guidelines calculation would make no difference to the choice of sentence." *United States v. Asbury*, 27 F.4th 576, 581 (7th Cir. 2022); *see also United States v. Tanksley*, 848 F.3d 347, 353 (5th Cir. 2017) ("[I]t is not enough for the district court to say the same sentence would have been imposed but for the error."). Instead, this Court has instructed district courts to "provide[] a fulsome explanation of each factor [under 18 U.S.C. § 3553(a)] that it was required to consider in sentencing," and explain how the same sentence would have resulted from that analysis. *Florentine*, 147 F.4th at 484.

The district court failed to meet that bar. First, while the district court purported to have "considered all the factors in 18 U.S.C., Section 3553(a)," JA271 (Tr. 49:7-8), it did not—by its own admission—provide a "fulsome explanation of each factor that it was required to consider in

sentencing," *Florentine*, 147 F.4th at 484. Instead, the district court—in its own words—"discuss[ed] some *but not all* of those factors in detail." JA271 (Tr. 49:12-13) (emphasis added).

For example, Section 3553(a)(2)(C) requires the court to consider "the need for the sentence imposed to protect the public from further crimes of the defendant." The parties devoted significant briefing to this issue at sentencing. *See* JA189; JA83; JA199-200. Indeed, the fact that Tanoh had "stopped committing money laundering nearly five years ago" and "remained infraction free on pretrial release for nearly two years" was at the heart of defense counsel's argument that Tanoh should be sentenced to probation. JA199-200. The district court not only failed to explain its findings on this factor—it didn't ask the parties *any* questions about it at sentencing. That lack of explanation is itself a significant procedural error. *United States v. Ross*, 912 F.3d 740, 744 (4th Cir. 2019) ("Under the law of this circuit a district court must address or consider *all non-frivolous reasons* presented for imposing a different sentence and *explain why he has rejected those arguments*." (emphasis added)).

Second, the district court's statement that it would have imposed the same sentence notwithstanding any Guidelines error was completely

generic—it did not address the Section 3B1.2 error specifically. And the district court's discussion of the select Section 3553(a) factors it *did* address came entirely *before* that inoculating statement. *See* JA271-275 (Tr. 49:5-53:20). As a corollary, the district court failed to explain how it would have chosen the same sentence under Section 3553(a) even if Tanoh had received the minor-participant adjustment. Such "generic disclaimer[s] of all possible errors" have been rejected by this Court's sister circuits.[6] And for good reason: without an explanation that specifically addresses the Guidelines error, the Court "cannot say with confidence that the district court would have reached the same sentence despite the guidelines error." *Asbury*, 27 F.4th at 582; *see also Montes-Flores*, 736 F.3d at 370 (to find error harmless, the Court "must know that the district court would have reached the same result even if it had decided the Guidelines issue the other way" (cleaned up)); *United States*

[6] *Asbury*, 27 F.4th at 581-82 ("[T]he judge must give specific (though not necessarily lengthy) attention to the contested guideline issue in her explanation . . . and account for why the potential error would not affect the ultimate outcome." (internal quotation marks and citation omitted)); *Tanksley*, 848 F.3d at 353 ("[I]t is not enough for the district court to say the same sentence would have been imposed but for the error. The government must point to evidence in the record that convincingly demonstrates the district court would impose the *same* sentence for the *same* reasons." (cleaned up)).

*v. Bravo*, 26 F.4th 387, 397 (7th Cir. 2022) (district court must "go[] beyond a flat statement that the guidelines were irrelevant and offer[] *a specific reason why a dispute under the guidelines did not affect the sentence*" (emphasis added)).

Third, and relatedly, the district court's analysis of the Section 3553(a) factors was fundamentally grounded in its erroneous calculation of the Guidelines range. For example, in discussing the "nature of the offense" (JA271 (Tr. 49:13)) under Section 3553(a)(1), the district court explained that the "guideline range" was "driven by the loss amount," which "raise[d] the offense level to a level higher than is necessarily appropriate for Ms. Tanoh." JA272 (Tr. 50:21-24). For that reason, among others, the district court found "that a downward variance *from the guideline range* is warranted." JA275 (Tr. 53:1-2) (emphasis added). While this shows that the district court disagreed with the Guidelines range, it likewise demonstrates the erroneous Guidelines range's anchoring effect: instead of offering "a detailed explanation of the basis for a parallel result," *Asbury*, 27 F.4th at 581 (internal quotation marks and citation omitted), the district court instead offered certain Section 3553(a) factors as a reason to depart from the incorrect Guidelines range.

*See United States v. Van Sach*, 104 F.4th 1003, 1006 (7th Cir. 2024) (per curiam) (vacating sentence where "[t]he court seemed to justify its decision by highlighting certain § 3553(a) factors . . . but the court did not spell out how these concerns excused any consideration of or were untethered to the guidelines range"). The district court thus failed to show that the "sentence imposed . . . had nothing to do with the Guidelines calculation." *Tanksley*, 848 F.3d at 353.

## II. Tanoh's Sentence Is Procedurally Unreasonable Because the District Court Failed to Conduct an Individualized Assessment in Determining the Term of Her Supervised Release

In addition to its failure to apply the minor-participant reduction, the district court committed procedural error in determining the length of Tanoh's supervised release. The district court sentenced Tanoh to two years of supervised release, twice as long as Tanoh requested. It did so without addressing *any* of Tanoh's mitigation arguments, and it failed to conduct the "individualized assessment" that Section 5D1.2 requires. Because this issue "involve[s] a legal interpretation of the Sentencing

Guidelines," the court reviews the district court's decision *de novo*. *Schaal*, 340 F.3d at 198.

### A. The District Court Ignored Section 5D1.2's Requirement to Conduct an "Individualized Assessment" in Determining the Term of Tanoh's Supervised Release

Section 5D1.2 of the Sentencing Guidelines provides guidance for district courts in determining the length of a period of supervised release. A recent amendment to Section 5D1.2—effective November 1, 2025—significantly changed the way that district courts are to approach the analysis. *See* U.S.S.G. app. C, amend. 835 (effective Nov. 1, 2025). Whereas the previous version of Section 5D1.2 recommended minimum terms based on the class of offense, amended Section 5D1.2 provides courts with greater flexibility. That enhanced flexibility is now accompanied by significant procedural requirements: the sentencing court must "conduct an individualized assessment to determine the length of the term," U.S.S.G. § 5D1.2(a), and it "should state in open court the reasons for the length of the term imposed," *id.* § 5D1.2(b).

The district court was aware of this recent amendment, and it invited the parties to express their "view[s] on what the appropriate amount [of supervised release] is and why." JA268 (Tr. 46:21-24). Tanoh

requested one year of supervised release "based on an individualized assessment" given that Tanoh had done "very well" during her two years of pretrial supervision, during which she had no violations and "demonstrated that she knows how to find, maintain, and seek employment." JA270 (48:5-10).

Despite acknowledging the 2025 amendment, however, the district court failed to conduct the required individualized assessment. Its entire analysis (such as it was) amounted to a single, conclusory sentence:

> Sentence will be followed by a term of supervised release of two years, which I conclude is the amount necessary both to facilitate payment of restitution and to ensure that Ms. Tanoh will likely have -- given that she'll have initial financial difficulties getting her life restarted, she can be monitored during that vulnerable time to avoid recidivism.

JA275-276 (Tr. 53:21-54:1).

That explanation was procedurally inadequate for at least two reasons. First, as Application Note 1 to Section 5D1.2 makes clear, the "factors to be considered" in "conducting an individualized assessment to determine the length of a term of supervised release" are "the same as the factors considered in determining whether to impose such a term." *See* U.S.S.G. § 5D1.2 cmt. n.1. In other words, the court must consider the Section 3553(a) factors listed in Application Note 1 to Section 5D1.1

in determining the length of supervised release. *See* U.S.S.G. § 5D1.2 cmt. n.1; *id.* § 5D1.1 cmt. n.1. The district court's perfunctory statement does not evince serious consideration of any of those factors; it did not, for example, consider "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the need . . . to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B), or "the need to avoid unwarranted sentence disparities," *id.* § 3553(a)(6). Instead, it offered only generic justifications that would support *any* term of supervised release, not the specific term the district court selected. That is the opposite of the "individualized assessment" that Section 5D1.2 now requires.

Second, the district court failed to engage at all with Tanoh's mitigation arguments. That alone is a significant procedural error: "[u]nder the law of this circuit a district court must address or consider all non-frivolous reasons presented for imposing a different sentence and explain why he has rejected those arguments." *Ross*, 912 F.3d at 744. The district court certainly did not *address* Tanoh's arguments, and nothing in its single-sentence pronouncement suggests that it even *considered* them. Thus, as this Court concluded in *Ross*, "it is undisputable that the sentencing court provided an insufficient explanation of its sentence and

did not provide an 'individualized assessment' of important mitigation evidence." *Id.*

### B. The District Court's Failure to Conduct the Required Individualized Assessment Was Not Harmless

To overcome the district court's procedural error, "the government must show that explicit consideration of a defendant's mitigating arguments would not have affected the ultimate term of confinement imposed." *United States v. Shields*, 126 F.4th 356, 362 (4th Cir. 2025) (internal quotation marks and citation omitted). An error is not harmless if, after consideration of a defendant's mitigation arguments, "[t]he district court could have *conceivably* given [the defendant] a different sentence." *Ross*, 912 F.3d at 745 (emphasis added).

It is more than "conceivable" that the district court's on-the-record consideration of Tanoh's mitigation arguments would have resulted in a lower term of supervised release. The two-year term the district court selected—double what Tanoh requested—was based on the need to "facilitate payment of restitution" and "monitor[]" Tanoh "to avoid recidivism." JA275-276 (Tr. 53:21-54:1). Tanoh's mitigation arguments spoke directly to both of those concerns. Regarding restitution, Tanoh argued that she had "demonstrated that she knows how to find, maintain,

and seek employment" by working as a phlebotomist while her case was pending. JA270 (Tr. 48:9-10); JA189. She even brought her first restitution payment to the sentencing hearing. JA270 (Tr. 48:10-11). As for recidivism, Tanoh highlighted that she had "done very well" during two years of pretrial release, without a single violation or relapse since her criminal conduct ended more than five years ago. JA264 (Tr. 42:11-12); JA270 (Tr. 48:7-9).

The record does not suggest that the district court considered these arguments; its one-sentence pronouncement of Tanoh's supervised release term did not acknowledge them in any way. Under this Court's case law, the district court's failure to fulfill its "obligation to specifically address [Tanoh's] non-frivolous arguments" suggests that "explicit consideration of [Tanoh's] various mitigating arguments" might have affected "the ultimate term of confinement imposed." *Ross*, 912 F.3d at 745. That is especially true given that Section 5D1.2 now expressly requires an "individualized assessment" in determining the length of supervised release. *See* U.S.S.G. § 5D1.2.

## CONCLUSION

For the foregoing reasons, Tanoh respectfully requests that this Court vacate her sentence and remand this case to the district court for resentencing.

July 16, 2026

Respectfully submitted,

*/s/ Zachary N. Ferguson*
Daniel N. Lerman
Zachary N. Ferguson
Paul Brzyski
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
(202) 775-4500
zachary.ferguson@hsfkramer.com

James Wyda
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF MARYLAND

Paresh S. Patel
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
paresh_patel@fd.org

*Counsel for Appellant Tanoa Tanoh*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fourth Circuit Rule 34(a), Appellant Tanoa Tanoh respectfully urges this Court to hold oral argument on this appeal. Oral argument for Tanoh would be presented by undersigned counsel, an associate attorney at Herbert Smith Freehills Kramer.

Oral argument would aid this Court's resolution of this appeal for three reasons.

First, this case involves a significant question of first impression in this Circuit: whether a district court must defer to the Sentencing Commission's definition of "minor participant" in the commentary to U.S.S.G. § 3B1.2 under the Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. 558 (2019). This Court has not yet considered whether to defer to the Sentencing Commission's definition of "minor participant" in the commentary to U.S.S.G. § 3B1.2, and oral argument would aid the Court's deliberations in deciding this important and unresolved question.

Second, this case also involves a question of first impression in this Circuit concerning the interpretation of U.S.S.G. § 5D1.2. The Sentencing Commission's amendments to Section 5D1.2—effective November 1, 2025—materially changed how district courts are to

determine the length of a defendant's term of supervised release by requiring the court to "conduct an individualized assessment to determine the length of the term." *See* U.S.S.G. app. C, amend. 835. Oral argument would aid the Court in determining the metes and bounds of the "individualized assessment" that amended Section 5D1.2 requires.

Finally, this case involves a factually complicated assessment of Tanoh's culpability in the offense conduct relative to her co-conspirators. Oral argument would provide an opportunity for counsel to answer questions that the Court may have about the record.

July 16, 2026

Respectfully submitted,

*/s/ Zachary N. Ferguson*
Daniel N. Lerman
Zachary N. Ferguson
Paul Brzyski
HERBERT SMITH FREEHILLS
KRAMER (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
(202) 775-4500
zachary.ferguson@hsfkramer.com

James Wyda
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF MARYLAND

Paresh S. Patel
Assistant Federal Public Defender

6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
paresh_patel@fd.org

*Counsel for Appellant Tanoa Tanoh*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 26-4157 **Caption:** United States v. Tanoa Tanoh

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 10,016 [*state number of*] words

☐ this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 365 [*identify word processing program*] in
Century Schoolbook 14-point font [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
____________ [*identify word processing program*] in
____________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Zachary N. Ferguson

Party Name Tanoa Tanoh Date: 7/16/2026